USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 

No. 97-1880

 BOSTON POLICE SUPERIOR OFFICERS FEDERATION,
 DAVID ALDRICH, PATRICK CROSSEN and WILLIAM SLAVIN,
 
 Plaintiffs, Appellants,
 
 v.
 
 CITY OF BOSTON, BOSTON POLICE DEPARTMENT,
 PAUL EVANS and MASSACHUSETTS DEPARTMENT OF
 PERSONNEL ADMINISTRATION,
 
 Defendants, Appellees,
 
 MASSACHUSETTS ASSOCIATION OF MINORITY
 LAW ENFORCEMENT OFFICERS,
 
 Intervenor, Appellee.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. George A. O'Toole, Jr., U.S. District Judge]
 

 Before
 
 Selya, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 
 

 James F. Lamond with whom McDonald & Associates was on brief
for appellants.
 Jonathan M. Albano with whom Bingham Dana LLP, Ozell Hudson,
Jr., and Lawyers Committee for Civil Rights Under Law of the Boston
Bar Association were on brief for intervenor.

 Susan M. Prosnitz, Chief of Litigation, with whom Boston
Police Department Legal Advisor's office was on brief for City of
Boston, Boston Police Department and Paul Evans.
 Edward J. DeAngelo, Assistant Attorney General, with whom
Scott Harshbarger, Attorney General, was on brief for appellee.

June 22, 1998

 CAMPBELL, Senior Circuit Judge. This is an appeal from
the district court's granting of summary judgment in favor of
Defendants City of Boston, the Boston Police Department ("BPD"),
and other state actors. The BPD promoted Rafael Ruiz, an African-
American, to lieutenant prior to promoting any of the individual
Plaintiffs, each of whom scored one point better than Ruiz on the
lieutenant's examination. The BPD believed that promoting Ruiz was
necessary to avoid violating an amended 1980 federal court consent
decree, as then interpreted by a district court. The three white
officers and the Boston Police Superior Officers Federation (the
"Federation") sued in the district court, claiming that the consent
decree did not mandate Ruiz's promotion and that the BPD's race-
based action violated the officers' rights under the Equal
Protection Clause. 
 Contrary to the judicial interpretation followed by the
BPD, the district court in the instant case held that the consent
decree did not apply to promotions to lieutenant and did not
require Defendants to promote Ruiz. However, the court granted
Defendants' motion for summary judgment, concluding that Ruiz's
promotion served the compelling state interest of remedying the
effects of past racial discrimination, and that the promotion was
narrowly tailored to meet that goal. We affirm.

 FACTS
1. Background
 The BPD selects officers for promotion based largely on
their performance on a civil service examination. Officers who
pass the exam are placed on an "eligible list" by the Massachusetts
Department of Personnel Administration ("DPA"). When the Police
Commissioner is ready to make promotions, the DPA supplies a
"certification," or list, of the highest-scoring candidates from
the eligible list, ranking the candidates in order of their exam
scores. 
 Traditionally, the BPD has selected candidates for
promotion based almost exclusively on their certification scores,
departing from rank order for only two reasons. First, the
Commissioner has bypassed officers for cause, such as disciplinary
problems. Second, the Commissioner has on several occasions
"reached down" the list and selected a racial minority candidate in
order to comply with the terms of a since-expired federal court
consent decree. 
 That consent decree dated back to 1978, when the
Massachusetts Association of Afro-American Police, Inc. ("MAAAP"),
the predecessor-in-interest of the Massachusetts Association of
Minority Law Enforcement Officers ("MAMLEO"), sued the BPD in the
federal district court for racial discrimination in its promotion
practices. In 1978, black officers made up roughly 5.5 percent of
the BPD as a whole, and 20 percent of Boston's population, yet
among 222 BPD sergeants there was only a single black. The suit
settled in 1980 and the district court entered a consent decree,
the parties to which included the BPD, the DPA, MAMLEO's
predecessor-in-interest, and certain public officials. The
plaintiff class certified by the decree included "[a]ll present and
future black [BPD] sworn officers" a term of art meaning all
officers, including sergeants and lieutenants, see infra. 
 The decree set specific goals and timetables for
promotions of black officers to sergeant, provided for the plan's
dissemination within the BPD, and created an internal committee to
monitor the plan's progress. These goals were to be met by the
time of the decree's original expiration date of 1985. (As
explained below, the decree was extended, finally coming to an end
in 1995.) The decree also contained provisions (the scope of which
is now disputed, see infra) concerning validation of BPD
promotional exams and practices in accordance with the EEOC's
Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. 
1607.1 et seq.
 Two of the Guidelines' requirements are relevant here. 
First, the decree expressly required that the BPD's tests for
promotions to sergeant comply with Guidelines' standards for
validation of promotional tests. See 29 C.F.R. 1607.5; Original
Consent Decree 4-5, 4, 5. Second, the decree makes explicit
reference to the Guidelines' "four-fifths rule" for identifying
disparate impact in promotions: 
 A selection rate for any race . . . which is
 less than four-fifths (4/5) (or eighty
 percent) of the rate for the group with the
 highest rate will generally be regarded by the
 Federal enforcement agencies as evidence of
 adverse impact.
 
 29 C.F.R. 1607.4(D).
 The implementation of the decree proved quite difficult
with respect to promotional practices. Although the decree
prescribed annual promotions of officers from validated exams, by
1985 the BPD had not given any Guidelines-validated examinations,
and had met none of the decree's numerical goals for the promotion
of black officers. In 1985, MAAAP successfully sought to have the
district court extend the decree until 1990 and modify the decree's
numerical goals to reflect the increased number of qualified
African-American candidates in the BPD. 
 However, by 1990, the BPD had given only one "validated-
fair" exam, and the number of blacks promoted still fell short of
the decree's goals. As a result, the BPD and MAAAP jointly
requested that the court extend the decree until the BPD could give
one more "validated-fair" exam in June, 1991. 
 Following the 1991 exam's administration, MAMLEO
challenged its validity on the ground that it did not comport with
the Guidelines. The parties settled this challenge by jointly
proposing an amendment to the consent decree, which specifically
reaffirmed that selection procedures for the promotion to the
position of sergeant be validated in accordance with the
Guidelines. In addition, the amendment stated generally that the
BPD would establish the next eligible lists for promotion to
sergeant, lieutenant, and captain using selection procedures "of a
significantly different type and/or scope." 
 The district court approved the amendment, rejecting the
Federation's challenge that the amendment exceeded the scope of the
original decree by prescribing goals for lieutenant and captain. 
Significantly, the district court ruled that the decree imposed the
Guidelines' requirements on "promotional examinations for allranks" in the BPD (emphasis supplied). This court dismissed the
Federation's appeal on the ground that its challenge would not be
ripe for judicial review until a candidate was not "fairly
considered" for promotion. Massachusetts Ass'n of Afro-Am. Policev. Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992).
 Experts from the BPD, the DPA, and MAMLEO jointly
developed a civil service exam for the position of lieutenant that
was administered in September, 1992. The results of that test,
which was "content validated" according to the Guidelines, 29
C.F.R. 1607.5(B), generated the eligible list from which the BPD
made the promotions at issue here. 
2. The Promotion of Ruiz
 In early 1994, the BPD announced its intention to promote
twenty sergeants to lieutenant. These promotions were to be based
on the eligible list and certification generated from the 1992
exam. 
 The eligible list from that exam included sixteen blacks
and ninety whites. The nineteen highest-scoring candidates
included two blacks and seventeen whites. The next highest score
of 89 belonged to the three individual Plaintiff-Appellants here,
David Aldrich, Patrick Crossen, and William Slavin, each of whom is
white. (Four other sergeants scored 89, but did not bring suit.) 
Rafael Ruiz, an African-American, appeared next on the list with a
score of 88. 
 Had the BPD promoted from this certification strictly
according to score order, the twenty new lieutenants would have
comprised eighteen whites and two blacks. Based on the number of
each group that were eligible for promotion, rank-order promotion
would have yielded a selection rate of 20 percent for whites
(eighteen selected from ninety) versus 12.5 percent for blacks (two
of sixteen). Thus, the selection rate for black officers would
have been 62.5 percent of that for whites (12.5/20), raising an
inference of adverse impact under the Guidelines' four-fifths rule. 
See 29 C.F.R. 1607.4(D). Based on the district court's 1991
interpretation, the BPD believed such a result would have violated
the consent decree. By comparison, the promotion of an additional
black sergeant in place of the eighteenth white sergeant would
raise the promotion rate of blacks to 18.75 percent (three of
sixteen) while lowering that of whites to 18.89 percent (seventeen
of ninety), a near-equality that would easily satisfy the four-
fifths rule.
 After reviewing these results, both the DPA and MAMLEO
told the BPD that selecting lieutenants in strict rank order would
disparately impact African-American candidates. The BPD performed
its own analysis under the four-fifths rule, and also concluded
that promoting a white officer as the twentieth new lieutenant
would violate the Guidelines and would, therefore, violate the
consent decree as then understood. 
 Accordingly, in February 1995, the BPD chose Ruiz ahead
of the higher-scoring white candidates for the twentieth promotion
to lieutenant. Boston Police Commissioner Paul Evans gave the DPA
a written explanation of his decision to skip over the higher-
scoring candidates, see Mass. Gen. Laws ch. 31, 27 (providing
that in the event of a promotion not made strictly according to
certified rank order, "the appointing authority shall immediately
file with the [DPA] a written statement of his reasons for
appointing the person whose name was not highest"), which stated
that Commissioner Evans selected Ruiz "as a result of the Consent
Decree." It is undisputed that Commissioner Evans believed at the
time that the consent decree required the BPD to avoid a
promotional decision that would result in adverse impact under the
Guidelines, and that Commissioner Evans believed that the inclusion
of a third African-American among the twenty new lieutenants was
necessary to this end. 
 Following Commissioner Evans's decision, the three white
officers and the Boston Police Superior Officers Federation brought
the instant suit in the district court, challenging Ruiz's
promotion as contravening the Equal Protection Clause. The
district court granted Defendants' motion for summary judgment. 
The court first concluded that the consent decree did not require
Defendants to follow the Guidelines in respect to the 1992 exams
for lieutenants and captains (the test Ruiz took). Instead, the
district court affirmed on the ground that Ruiz's promotion was a
narrowly tailored means of advancing the BPD's compelling interest
in remedying racial discrimination. 
 In the meantime, the BPD promoted Aldrich and Crossen to
lieutenant in October, 1995, and Slavin in June, 1996. The consent
decree expired in April, 1995, based on the DPA's establishment in
January, 1995, of eligible lists from the 1992 exams. As of July
1, 1996, black representation among BPD sergeants had risen to 17
percent (46 of 269), and the promotion of Ruiz and two other blacks
raised blacks' representation among lieutenants to over 6 percent
(5 of 77). 

 DISCUSSION
I. Did the Consent Decree Mandate Ruiz's Promotion?
 It is undisputed that Defendants promoted Ruiz in genuine
reliance on the district court's then outstanding decision
interpreting certain consent decree requirements to apply to all
promotions including lieutenants'. Although Defendants were
following that judicial construction, Plaintiffs argue that Ruiz's
promotion was not, in fact, required by the terms of the consent
decree nor permitted under the Equal Protection Clause, which
ensures that no state or local government shall "deny to any person
within its jurisdiction the equal protection of the laws." U.S.
Const. amend. XIV, 1.
 Defendants' first line of defense is the consent decree,
which, through its invocation of the EEOC Guidelines, is argued to
have mandated Ruiz's promotion. This is the first time we have
reviewed the 1991 district court decision construing the consent
decree so as to apply to lieutenant promotions. Plaintiff-
Appellant Boston Police Superior Officers Federation earlier
appealed from that ruling, but we dismissed the appeal as unripe. 
Massachusetts Ass'n of Afro-American Police, Inc. v. Boston Police
Dep't, 973 F.2d 18 (1st Cir. 1992). The challenge ripened into a
justiciable controversy upon Defendants' promotion of Ruiz,
allowing Plaintiffs to bring the instant action. A different
district judge, from whom this appeal comes, then rejected
Defendants' and the earlier court's reading of the decree,
concluding that it did not require the BPD to promote Ruiz ahead of
the individual Plaintiffs.
 We affirm this latter interpretation. In our judgment,
neither the original consent decree nor the 1991 amendment required
the BPD to conform to the EEOC Guidelines in the promotion of
lieutenants, as opposed to sergeants. The original decree stated
that it concerned promotional tests "for the purpose of selecting
police officers for promotion." In context, "police officers"
means not all officers the decree refers to the set of all
officers as "sworn officers" but instead "patrolmen," or those
officers who might be elevated to sergeant. By contrast, the more
encompassing term "sworn officers" appears only in the decree's
statement of purpose. 
 Moreover, the decree's references to a specific rank are
confined to promotions to sergeant. For instance, the decree
provision mandating compliance with the EEOC Guidelines mentions
only the sergeant position: "The DPA will develop and administer
a promotional examination and/or other selection procedure(s) for
the position of police sergeant . . . which will be validated in
accordance with the Guidelines." Several other provisions
regarding examinations and promotions refer specifically to the
sergeant position and nowhere does the decree mention promotions to
lieutenant. Most important, the decree expressly states: 
 To the extent that this action involved
 allegations of employment discrimination in
 promotion other than to the rank of sergeant .
 . . such allegations are not resolved herein,
 nor are they intended to be, and they are in
 effect being voluntarily dismissed without any
 prejudice whatsoever.
 
 This language disavows any intention to resolve discrimination
allegations relative to others than sergeant. Consistently, the
1991 amendment, while providing generally that the BPD and the DPA
would establish a "significantly different" selection procedure for
all promotions, prescribes compliance with the Guidelines only in
the case of sergeants. Agreement To Amend Consent Decree 5, 6. 
 Defendants point to a few isolated passages in the
consent decree that are seemingly broader, including one providing
that "[p]romotional tests will be validated in accordance with the
[Guidelines]." However, we believe it wrong to read the latter
passage out of the context of the entire decree, which indicates
that the "promotional tests" to which it refers are only those to
the position of sergeant. For example, the decree speaks in the
general terms of "selecting police officers for promotion" and "any
promotional test," without qualification when providing for
Guidelines validation of the promotional tests. However, in the
next few paragraphs, the decree describes the ranking of "[p]ersons
passing future validated tests" again with no qualification 
before granting the BPD Commissioner power to "make appointments to
overcome any underutilization that may exist among sergeants"
(emphasis added). And on the same page the decree provides that
the DPA will be responsible for administering "new tests for
promotion to sergeant." As the decree contains no parallel
provisions referring to positions other than sergeant, we believe
that when the decree says promotions, it means only those to the
position of sergeant. Looking at the entire decree, especially the
passage expressly disclaiming any effect on positions other than
sergeant, we view the decree's generally worded passages as
reflecting an assumption that only sergeants' promotions were at
issue, not an intent to modify the lieutenants' test.
 Defendants' argument fares no better in light of the
context that gave rise to the decree. The original suit alleged
harm derived primarily from bias in entry-level hiring. To be
sure, that hiring eventually impacts the higher ranks, see infra,
but the decree itself evinced a concern with discrimination among
the lower ranks. Had the parties meant to extend the decree's
reach beyond the level of sergeant, they would have written it
differently. 
 Defendants place great weight upon the interpretation of
the consent decree given by the district court when approving the
1991 amendment to the decree. There, after pointing out that "the
class certified consisted of '[a]ll present and future black sworn
officers in the Boston Police Department,'" the court "rule[d] that
the consent decree applies to promotional exams for all ranks of
sworn police officers" and concluded that the decree imposed
"conformity to the [EEOC] Guidelines and provision of training with
respect to all promotional examinations." This was the
interpretation of the amended decree under which the BPD acted when
it promoted Ruiz ahead of the individual Plaintiff-Appellants. Seenote 3, supra.
 Defendants argue that we should accord less weight to the
subsequent interpretation by the district court below than to the
views of the judge who earlier entered the order amending the
consent decree. However, it was the parties, not the judge, who
jointly drafted and proposed the 1991 amendment, and we find the
text of the amended decree relatively clear on the point in issue. 
We conclude that it did not regulate promotions to the position of
lieutenant.
 Our reading also disposes of Defendants' related argument
that this action is forbidden by 108 of the Civil Rights Act of
1991, 42 U.S.C. 2000e-2(n)(1). That provision bars collateral
attacks on judgments in federal employment discrimination cases by
any person with "actual notice" of a judgment and a "reasonable
opportunity to present objections to such judgment or order." Id. 2000e-2(n)(1)(B)(i). However, this bar applies only if the
challenged "employment practice [] implements and is within the
scope of a litigated or consent judgment or order [resolving a
federal claim of employment discrimination]." Id. 2000e-
2(n)(1)(A). As the consent decree did not apply to promotions to
lieutenant, Ruiz's promotion was not "within the scope of" a
consent decree protected by 108. 
III. Strict Scrutiny
 Plaintiffs contended both below and on appeal that the
BPD's race-based promotion of Ruiz to lieutenant violated their
rights under the Equal Protection Clause, which ensures that no
state or local government shall "deny to any person within its
jurisdiction the equal protection of the laws." U.S. Const. amend.
XIV, 1. Just as "any individual suffers an injury when he or she
is disadvantaged because of his or her race, whatever that race may
be," Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 230 (1995),
it is well-settled that "the Fourteenth Amendment requires strict
scrutiny of all race-based action by state and local governments." 
Id. at 222 (emphasis added); see also City of Richmond v. J.A.
Croson Co., 488 U.S. 469, 493 (1989); Wygant v. Jackson Bd. of
Educ., 476 U.S. 267, 279-80 (1986). Thus, without the benefit of
the consent decree, the affirmative action of promoting Ruiz based
in part on his race was constitutionally permissible, as both
parties agree, only if it survives strict scrutiny. 
 The formula for strict scrutiny is familiar: the
government must demonstrate that its action served a "compelling
state interest," Croson, 488 U.S. at 505, and was "narrowly
tailored" to advance that interest, id. at 507-08.
 A. Compelling Governmental Interest in Remedying Past State Discrimination

 The compelling-interest prong of strict scrutiny is
designed "to 'smoke out' illegitimate uses of race by assuring that
the [government] is pursuing a goal important enough to warrant use
of a highly suspect tool." Id. at 493. To date, the Supreme Court
has identified only one goal sufficiently important to justify the
use of affirmative action in public employment: remedying a
governmental body's own past racial discrimination. See Wygant,
476 U.S. at 274 (explaining that compelling-interest prong requires
"some showing of prior discrimination by the governmental unit
involved"). As the Court explained in Croson, "[c]lassifications
based on race carry a danger of stigmatic harm. Unless they are
strictly reserved for remedial settings, they may in fact promote
notions of racial inferiority and lead to a politics of racial
hostility." Croson, 488 U.S. at 493.
 To justify its remedial action, the government cannot
rely on a desire to correct generalized, amorphous wrongs. Seeid. "[V]oluntary affirmative action plans cannot be
constitutionally justified absent a particularized factual
predicate demonstrating the existence of 'identified
discrimination.'" Cohen v. Brown Univ., 101 F.3d 155, 171 (1st
Cir. 1996) (citing Croson, 488 U.S. at 500-06), cert. denied, 117
S. Ct. 1469 (1997). "[T]he basic question . . . is an evidentiary
issue: Is there a "'strong basis in evidence' for the conclusion
that the [government action] here at issue serve[d] a remedial
purpose with respect to past discrimination." Roache, 951 F.2d at
450 (quoting Croson, 488 U.S. at 500) (emphasis in original). The
"strong basis" may consist of either "a contemporaneous or
antecedent finding of past discrimination by a court or other
competent body," Wygant, 476 U.S. at 289 (O'Connor, J.,
concurring), or evidence "approaching a prima facie case of a
constitutional or statutory violation." Croson, 488 U.S. at 500.
 We think Defendants have made a sufficient showing that
Ruiz's promotion served a proper remedial purpose. First, the
BPD's history of racial discrimination is well-documented in the
decisions of this court. In 1972, we affirmed a district court's
finding that the BPD discriminated against black applicants through
the use of entry-level testing procedures that favored whites. 
Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972). As we noted in
Castro, that discrimination resulted in a gross racial disparity
among the BPD's ranks: in 1970, only two percent of BPD officers
were black or Latino; by comparison, these groups constituted 16
percent of the general population. Id., 425 F.2d at 728.
 Nineteen years after Castro, this court in Stuart, supra,
again considered the evidence of past racial discrimination within
the BPD, and in particular the claims that were settled by the
amended Consent Decree, and saw little evidence of progress toward
remedying the discrimination cited in Castro. In Stuart, we
concluded that the Consent Decree was justified by a strong basis
in evidence, see 951 F.2d at 449-53, based in part on the fact that
racial discrimination in entry-level hiring had adversely affected
blacks' representation at the rank of sergeant, see id. at 452. 
"[R]emedial action takes time," we reasoned, "and discrimination
may linger for many years in an organization that had excluded
blacks from its ranks." Id.
 The same logic dictates that the BPD's historic
discrimination negatively affected the number of black lieutenants
at the time of Ruiz's promotion. The documented results of that
discrimination were that the BPD hired and promoted fewer blacks to
sergeant than it would have absent any racial discrimination. 
Since the BPD selects its lieutenants solely from the ranks of
sergeant, it follows that discrimination in promotions to sergeant
reduced the pool of blacks eligible to compete for promotions to
lieutenant. 
 The effect of prior discrimination was compounded by the
fact that experience makes up twenty percent of the score assigned
to a candidate for promotion a fact that, according to both
Defendants' expert and the BPD's personnel director, negatively
impacts black (who were on average less experienced) candidates. 
Moreover, it takes years to rise through the ranks of the BPD. Seeid. at 452 (noting that "[w]hile an officer must have served three
years to apply to become a sergeant, successful applicants had
served an average of seven or more years in the police force"). As
this court stated when last considering the MAMLEO-BPD consent
decree, "[o]bviously, if few blacks become police officers, few
blacks will become sergeants." Id. It is just as obvious that
discrimination that prevents blacks from becoming sergeants will
also prevent blacks from reaching the level of lieutenant. Seealso United States v. Paradise, 480 U.S. 149, 168-69 (1987)
(plurality opinion) ("Discrimination at the entry level necessarily
precluded blacks from competing for promotions, and resulted in a
departmental hierarchy dominated exclusively by non-minorities. .
. . [The Department cannot] segregate the results achieved by its
hiring practices and those achieved by its promotional
practices."); id. at 196 (O'Connor, J., dissenting) (agreeing with
Paradise plurality that "the Department's egregious history of
discrimination" warranted a race-based remedy).
 Relatedly, we do not think this evidence is too
temporally remote to justify the conclusion that the BPD's past
racial discrimination has manifest effects in the present status of
black officers. We must be wary, of course, of "remedial measures
that are 'ageless in their reach into the past, and timeless in
their ability to affect the future.'" Cohen, 101 F.3d at 171
(quoting Wygant, 476 U.S. at 276). The question whether past
discrimination warrants current action is fact-intensive. For
instance, aware that racial discrimination can have long-lasting
effects, we determined in Stuart that remedial action in 1990 was
justified in part by a 1981 statistical disparity. See 951 F.2d at
451-52. Moreover, in reaching the conclusion that "litigated court
findings of recent entry-level discrimination would seem sufficient
to justify race-conscious remedies at both entry and promotional
levels," id. at 452 (emphasis added), we did not say that such
findings were necessary.
 Here, the district court relied on substantial evidence
that the effects of the BPD's past discrimination persisted at the
rank of lieutenant until Ruiz's promotion. The BPD had no black
lieutenants as recently as 1978, and only two in 1992; the 1995
promotion of three blacks, including Ruiz, more than doubled this
number. Thus, in July, 1996, only five of seventy-seven
lieutenants, roughly six percent, were black. By then, the number
of blacks among the BPD's 269 sergeants had risen to 46, suggesting
the remedial effects of the consent decree as to sergeants, but
also that such effects had yet to work their way to the rank of
lieutenant. 
 The BPD had further justification in 1995 for race-based
action in the statistical proof of a violation of the four-fifths
rule. As already noted, had the BPD promoted in strict rank order,
the results would have supported an inference of discriminatory
impact under the Guidelines. This statistical evidence adds to the
foregoing and reinforces the BPD's conclusion that it had not yet
succeeded in remedying the effects of its history of
discrimination. In the first of many objections to this
statistical evidence, Plaintiffs-Appellants correctly point out
that a violation of the four-fifths rule, standing alone, is not
conclusive evidence of discrimination. We agree with their
principal objection, but we also think that the four-fifths rule
can, in the words of the Supreme Court in a different context,
properly serve "as a benchmark against which . . . to gauge
[Defendants'] efforts to remedy past discrimination." Local 28,
Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 478 (1986)
(plurality opinion). Against this benchmark, the BPD's efforts at
remedying the effects of past discrimination were still lacking. 
 Second, Plaintiffs point out that the 1992 exam was
content-validated according to the Guidelines. It follows, they
argue, that the results of a fair and unbiased exam cannot be the
basis for race-based action. However, past discrimination, if
sufficiently pervasive, may justify consideration of race in
promotions even when candidates have taken a validated exam. As we
wrote in approving such a promotional measure, "validated exams are
not an end in themselves but merely a means toward achieving the
decree's actual objective: rough parity (to remedy the effects of
past discrimination)." Mackin v. City of Boston, 969 F.2d 1273,
1277 (1st Cir. 1992). 
 Plaintiffs also dispute the denominator used in the BPD's
four-fifths calculation, arguing that we should compare the number
of blacks and whites selected for promotion to the number of each
race among the forty-two candidates certified by the DPA, rather
than those who made the "eligible" list by simply passing the test. 
Under that approach, the selection rate would have actually been
higher among blacks (two of four) than whites (eighteen of thirty-
eight). 
 "[W]hen special qualifications are required to fill
particular jobs, comparison to the general population (rather than
to the smaller group of individuals who possess the necessary
qualifications) may have little probative value." Croson, 488 U.S.
at 501. We think the comparison of sergeants who passed the civil
service exam to those whom the BPD promoted adequately captures the
fact that the lieutenant position requires "special
qualifications." Certainly, nothing compels the conclusion that
finishing among the top forty-two candidates is any more a
"qualification" than earning a passing score. It is the latter
criterion that determines whether a candidate can ever be selected
for promotion, whether in the current or a later promotional round. 
 Finally, Plaintiffs contend that the sample of eligible
employees was too small to be statistically meaningful, relying
largely on Fudge v. City of Providence Fire Dep't, 766 F.2d 650
(1st Cir. 1985). There, we reversed a finding of Title VII
liability based largely on the inadequacy of plaintiff's analysis
under the four-fifths rule. Plaintiff's sole evidence of disparate
impact was that only 4 percent of 24 black applicants passed the
employer's entrance exam, as compared with 13 percent of 224 white
applicants. We held that this evidence, standing alone, was
insufficient to support a finding of Title VII liability. See id.at 657-58. We cautioned that "in cases involving a narrow data
base, the better approach is for the courts to require a showing
that the disparity is statistically significant, or unlikely to
have occurred by chance, applying basic statistical tests as the
method of proof." Id. at 658. Since the sample size here was
smaller than that rejected in Fudge, Plaintiffs reason that we must
disregard the four-fifths rule as irrelevant.
 We disagree because Defendants here adequately met the
concerns expressed in Fudge. DPA's expert in public safety testing
and promotional procedures, Dr. Frank Landy, pointed out that the
Department of Justice has addressed the Guidelines' use in cases of
small samples. See generally Questions and Answers on the Federal
Executive Agency Guidelines on Employee Selection Procedures, 44
Fed. Reg. 11996 (1979). This commentary states that use of the
four-fifths rule is "inappropriate . . . where the number of
persons and the difference in selection rates are so small that the
selection of one different person for one job would shift the
result from adverse impact against one group to a situation in
which that group has a higher selection rate than the other group." 
44 Fed. Reg. 12000. 
 Landy applied this test to the data on the June, 1995,
candidates for promotion to lieutenant, and concluded that an
adverse impact would remain even if the BPD had promoted an
additional (i.e., a third) African-American to lieutenant. This
expert testimony which Plaintiffs did not rebut with an expert
of their own distinguishes the instant case from Fudge. SeeFudge, 766 F.2d at 658 (noting that plaintiff had failed to present
expert testimony). Moreover, unlike Fudge, the promotional rates
were only a small part of the overall evidence of discrimination,
rendering the statistical disparity "unlikely to have occurred by
chance." Id.; cf. 29 C.F.R. 1607.4(D) (noting that "[s]maller
differences in selection rate may nevertheless constitute adverse
impact . . . where a user's actions have discouraged applicants
disproportionately on grounds of race"). Where, as here, the
sample size is small, "it is both dangerous to rely too heavily on
the figures and unfair to ignore them entirely." Boston Chapter,
NAACP, Inc. v. Beecher, 504 F.2d 1017, 1021 n.6 (1st Cir. 1974). 
We believe that to find a "strong basis in evidence" does not, in
these circumstances, necessitate placing an undue emphasis on the
violation of the four-fifths rule.
 Having reviewed the statistical evidence of present
racial disparities among BPD lieutenants, and the documented
history of racial discrimination in the BPD, we add a further word
about the connection between the two. As we have noted, this
connection is explained in part by common sense: once implemented,
fair procedures for choosing low-level employees may take years to
show results in the higher ranks. This is especially so in light
of the difficulty the BPD had in implementing the consent decree. 
 This tortuous history, combined with the persistent
effects of discriminatory practices at the entry and sergeant
levels, sufficiently links the BPD's past discrimination and the
statistical disparities contemporaneous with Ruiz's promotion. SeeParadise, 480 U.S. at 168-70 (plurality opinion); cf. Hopwood v.
Texas, 78 F.3d 932, 952 (5th Cir.) ("The effects must themselves be
examined to see whether they were caused by the past discrimination
and whether they are of a type that justifies the program."), cert.
denied, 116 U.S. 2581 (1996). Given the BPD's halting and, at
times, quite modest progress in remedying its earlier
discrimination, we are reluctant to infer that the vestiges of that
discrimination had substantially disappeared when the BPD promoted
Ruiz. The evidence warranted the district court's conclusion that
the 1996 "statistical disparity combines with judicial findings of
past entry-level discrimination by the BPD to imply convincingly
that historical discrimination has affected the promotion of
minority sergeants to the rank of lieutenant, and that the
lingering effects of that discrimination were present in 1995 when
the BPD promoted Ruiz." 
 Plaintiffs attack the district court's reliance on past
findings of racial discrimination within the BPD as irrelevant in
light of the BPD's subjective reliance on the consent decree. 
Noting the uncontested fact that Commissioner Evans promoted Ruiz
based on the belief now mistaken, it turns out that the consent
decree so required, they argue that "the defenders of the
challenged discrimination . . . could not offer additional reasons,
not relied on by Commissioner Evans, for the proposition that the
BPD's discrimination was remedial." Thus, Plaintiffs reason,
Ruiz's promotion is constitutionally valid only if, as Commissioner
Evans initially thought, the consent decree required it; since the
decree did not, the promotion cannot stand.
 The short answer to this argument is that it draws an
unnecessary, and ultimately untenable, distinction between two
motives: complying with the consent decree, on the one hand, and
remedying past racial discrimination, on the other. To say that
Commissioner Evans promoted Ruiz in order to comply with the
consent decree does not prove that he acted without regard to the
goal of addressing past wrongs. In fact, the former so much
implicates the latter that Commissioner Evans, who stated in his
affidavit that he was concerned with avoiding adverse impact on
minority candidates, was undoubtedly pursuing both goals at once.
 Moreover, based on the statistics already described,
Commissioner Evans was justified in taking some remedial action. 
Based on those statistics, both the DPA and MAMLEO warned
Commissioner Evans that promoting lieutenants according to strict
rank order would raise an inference of discrimination. Thus, the
avoidance of discrimination was an objective that Commissioner
Evans expressly contemplated. Accordingly, even if we adopted
Plaintiffs' premise that the only motivation that matters is that
subjectively possessed by the official responsible for the
challenged action, that motivation heading off a potential
discrimination claim would be lawful. See Marcantel v. Louisiana
Dep't of Transp. & Dev., 37 F.3d 197, 202 (5th Cir. 1994) ("[A]
good faith settlement of a claim of past discrimination constitutes
a legitimate, nondiscriminatory reason for making employment
decisions."). Indeed, given Commissioner Evans's unquestioned
good-faith belief, supported by the court's ruling, that the
consent decree required Ruiz's promotion, it would be odd to
describe his motivation as animus or hostility toward the white
Plaintiffs on the basis of their race, or an improper desire to
play racial politics. 
 B. Narrow Tailoring
 Narrow-tailoring analysis "ensures that the means chosen
fit [the government's] compelling goal so closely that there is
little or no possibility that the motive for the classification was
illegitimate racial prejudice or stereotype." Croson, 488 U.S. at
493. In conducting a narrow-tailoring analysis, we consider:
 the extent to which (i) the beneficiaries of
 the order are specially advantaged; (ii) the
 legitimate expectancies of others are
 frustrated or encumbered;(iii) the order
 interferes with other valid state or local
 policies; and (iv) the order contains (or
 fails to contain) built-in mechanisms which
 will, if time and events warrant, shrink its
 scope and limit its duration.
 
 Mackin, 969 F.2d at 1278.

 An examination of these factors reveals that Ruiz's
promotion was a sufficiently narrow remedy. First, Ruiz, the only
beneficiary of the contested government action, was not
"specially," or unfairly, benefitted by his promotion. Ruiz's
performance on the 1992 exam was not only passing, but only one
point shy of that of the candidates bypassed for his promotion. In
Stuart, by comparison, we approved the remedial promotion of
candidates from below the "certification" cut-off of "2n + 1"
candidates, see 951 F.2d at 449, a far greater gap in scores. 
 Moreover, there was unanswered evidence that the one-
point difference between Ruiz's score and that of the white
Plaintiffs was, as a matter of testing accuracy, negligible. 
According to the DPA's expert testimony, "candidates who scored
within a three-point band should be considered functionally
equivalent . . . and equally qualified to successfully perform the
job as any other person in that score band." Further, Plaintiffs
do not argue that Ruiz lacks any of the skills or qualifications
necessary for his work. Finally, the fact that the Plaintiffs each
were promoted to lieutenant within a year suggests that the benefit
to Ruiz was mostly a temporal one. In light of these facts, the
advantage given Ruiz was quite marginal, see Stuart, 951 F.2d at
454; Mackin, 969 F.2d at 1278, and no greater than necessary to
remedy the BPD's past discrimination.
 Second, Ruiz's promotion did not unduly frustrate
Plaintiffs' legitimate expectations. See Mackin, 969 F.2d at 1278. 
Plaintiffs' expectation of promotion could not have been overly
firm. For one thing, there were more candidates for lieutenant
than available positions. See Johnson v. Transportation Agency,
480 U.S. 616, 638 (1987) (concluding that where seven qualified
applicants sought a single position, "denial of the promotion
unsettled no legitimate, firmly rooted expectation on the part of
the [candidate not selected]"); Mackin, 969 F.2d at 1278. 
Moreover, Massachusetts law does not give civil servants a property
right in promotions. See Bielawski v. Personnel Adm'r of Div. of
Personnel Admin., 663 N.E.2d 821, 827 (Mass. 1996). Additionally,
the departure from strict rank order "limits only to a rather small
extent the ability of white police officers to become sergeants. 
Indeed, white officers passed over on one test may be considered
for future appointments." Stuart, 951 F.2d at 454. In fact, as
noted, the BPD subsequently promoted two of the three Plaintiffs to
lieutenant within eight months of Ruiz's promotion, and the third
within sixteen months. This delay in promotion is a relatively low
burden to impose in the name of remedying racial discrimination,
see Paradise, 480 U.S. at 183 (plurality opinion) (observing that
"plainly postponement imposes a lesser burden" than the "[d]enial
of a future employment opportunity" or a layoff), even for
individuals who bear no responsibility for the past wrongs, seeWygant, 476 U.S. at 281 (plurality opinion) ("As part of this
Nation's dedication to eradicating racial discrimination, innocent
persons may be called upon to bear some of the burden of the
remedy."). 
 Third, Ruiz's promotion did not unduly interfere with any
valid policies. Selection on the basis of strict rank order, while
not required, is presumably designed to ensure that candidates are
chosen on the basis of their ability to do the job. Reaching down
the list to select Ruiz appears to have advanced this goal; as
noted above, his test score indicated that he and Plaintiffs shared
virtually identical qualifications, and Plaintiffs do not even
suggest that the BPD did itself a disservice in elevating him ahead
of Plaintiffs.
 Finally, the BPD's affirmative action is limited strictly
to the single promotion of Ruiz. As explained in Mackin, one
measure of a remedy's narrow-tailoring is the extent to which it
includes "built-in mechanisms" that will eventually "shrink its
scope and limit its duration." Plaintiffs contend that Ruiz's
promotion is overbroad because Defendants have not put their action
into the context of a larger plan; without such a plan, they argue,
we cannot tell whether the relief was necessary, or whether it is
likely to occur again. 
 We disagree. The BPD acted in reasonable, good-faith
reliance on a district court's construction of a consent decree
that has now expired. Both the BPD and the DPA have represented
Ruiz's promotion as a one-time remedy. The decision to reach down
the list to Ruiz resulted from the unique combination of the
district court's 1991 order interpreting the decree as applying to
lieutenant promotions, the BPD's history of past discrimination,
and statistics indicating that affirmative action was appropriate
to avoid potentially actionable disparate impact in this situation. 
Such "ad hoc administrative action" tells us little about "[w]hat
[the government] would do in some other, hypothetical case." Rasov. Lago, 135 F.3d 11, 17 (1st Cir. 1998) (rejecting equal
protection challenge to HUD fair-housing redevelopment plan that
altered statutory preferences given by state law to former
residents who happened to be white). Our conclusion that the BPD
was justified in taking race-based remedial action is based
strictly on these unique circumstances, and does not give the BPD
a license to depart from strict rank order in future promotions. 
Whether any similar factors are left that might warrant future
remedial action is a question that we need not now address; suffice
it to say that Ruiz's promotion in the particular circumstances
portends no effects whatsoever on the BPD's future promotional
decisions.
 We also note that there is no suggestion that any race-
neutral measure would have been adequate to remedy the BPD's past
discrimination. See Croson, 488 U.S. at 507 (criticizing city's
failure to consider "race-neutral means"). Race-neutral measures,
such as education or recruitment, would not provide a timely
remedy. Confronted with evidence of disparate impact and,
simultaneously, serious delays in needed promotions induced by
litigation over the consent decree, Commissioner Evans did the
minimum necessary to ensure that the promotions helped remedy the
BPD's past discrimination.
 The district court's grant of summary judgment is
affirmed.