23 F.3d 1013
 64 Fair Empl.Prac.Cas. (BNA) 1611,
64 Empl. Prac. Dec. P 43,018
The VANGUARDS OF CLEVELAND, et al., Plaintiffs-Appellees,
v.
The CITY OF CLEVELAND, et al., Defendants-Appellees.
Local Union No. 93, I.A.F.F., AFL-CIO, Intervenor-Appellant.
 No. 92-4315.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 18, 1994.
Decided May 6, 1994.
 
 Edward R. Stege, Jr. (argued and briefed), Stege, Hickman & Lowder, Cleveland, OH, for plaintiffs-appellees.
 Malcolm C. Douglas (argued and briefed), Office of the Director of Law, Cleveland, OH, for defendants-appellees.
 Joseph W. Diemert, Jr. (argued and briefed), Joseph W. Diemert, Jr. & Assoc., Cleveland, OH, for intervenor-appellant.
 Barbara L. Sloan (briefed), E.E.O.C., Office of Gen. Counsel, Washington, DC, amicus curiae E.E.O.C.
 Before: MILBURN and GUY, Circuit Judges; and TIMBERS, Senior Circuit Judge.*
 MILBURN, Circuit Judge.
 
 
 1
 Intervenor, International Association of Firefighters, Local Number 93 ("Union"), appeals the decision of the district court modifying the terms of a 1983 consent decree entered into between the Vanguards, an association of black and hispanic firefighters in Cleveland, Ohio, and the City of Cleveland ("City"). On appeal, the issues are (1) whether the district court abused its discretion when it modified the consent decree without applying the two-part test set forth in Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), to determine whether the modification was warranted; and (2) whether the district court committed reversible error when it refused to hear evidence proffered by the Union concerning the validity of the City's 1984 and 1985 promotional examinations before approving the modification to the consent decree. For the reasons that follow, we affirm.
 
 I.
 
 2
 In October 1980, the Vanguards filed an action against the City, alleging that the City had discriminated, both in policy and practice, against minority firefighters on the basis of race in promotions to the positions of lieutenant, captain, battalion chief, and assistant chief, all of which are supervisory positions in the City's Division of Fire. Since the City had previously been found liable for using discriminatory hiring practices in its police and fire departments, the City sought to negotiate a settlement with the Vanguards. As a result, the City and the Vanguards submitted a proposed consent decree to the district court in November 1981.
 
 
 3
 The Union, which represented the majority of the City's firefighters, intervened in the action. Although the Union did not participate in the initial negotiations between the City and the Vanguards, it filed objections to the proposed consent decree. Following several hearings on the Union's objections, the district court referred the matter to a magistrate judge in order to permit further discussions on the proposed consent decree. As a result of these discussions, the City and the Vanguards negotiated an Amended Consent Decree ("consent decree").
 
 
 4
 In the consent decree, the City conceded that "there [had] been a long history of discrimination against minority persons in the hiring practices and the promotion practices of the City of Cleveland Division of Fire." J.A. 43. The consent decree also stated that the Vanguards and the City were "desirous of effectuating a remedy which will eliminate all vestiges of discrimination in the promotion practices of the City of Cleveland Division of Fire." J.A. 44. To achieve this objective, the City agreed to base future promotions on "non-discriminatory and demonstrably job related" criteria, particularly, the results of promotional examinations to be administered in 1984 and 1985. J.A. 47, 49. The City also agreed to promote equal numbers of minority and non-minority firefighters from the lists of individuals who passed the two promotional examinations until all qualified minorities had been promoted. This would alter the normal practice in the City's Division of Fire, which was to promote from the eligibility lists in rank order, based upon the score achieved on the examination. Once all qualified minorities had been promoted from the lists, any additional openings could be filled with nonminorities.
 
 
 5
 Following certification of the 1985 eligibility lists, the consent decree identified specific long-range minority hiring goals for each officer position in the City's Division of Fire; namely, 25 percent for lieutenants and 20 percent for each of the other positions which would result in an overall average of 23 percent minority employment in supervisory positions. The consent decree stated that these goals were to be met by November of 1987, when the eligibility lists from the 1985 promotional examination were to expire. Further, the consent decree stated that "[e]xclusive jurisdiction is reserved in the [district court] for all purposes of enforcement, modification, or amendment of this Decree ... to guarantee the continuing effectuation of the goal of eliminating the ongoing vestiges of past discrimination ... as it impacts upon promotion within the Division of Fire." J.A. 52-53.
 
 
 6
 Although both the City and the Vanguards agreed to the proposed consent decree, the membership of the Union overwhelming voted to reject it. Following another hearing, the district court approved the consent decree on January 31, 1983. The Union appealed the entry of the 1983 consent decree; however, the consent decree was upheld by this court, see Vanguards v. City of Cleveland, 753 F.2d 479 (6th Cir.1985), and by the Supreme Court, see Local Number 93 v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).
 
 
 7
 In 1984 and 1985, the City administered promotional examinations. Based on the results of those examinations, the City promoted equal numbers of minority and nonminority firefighters until the lists of qualified minorities had been exhausted. Overall, approximately 60 minority and 206 nonminority firefighters were promoted between 1983 and November 1987. As a result, the percentage of minority officers in the City's Division of Fire increased from approximately 5 percent to approximately 17 percent.
 
 
 8
 In November of 1987, the Vanguards filed a motion seeking to have the consent decree extended on two grounds: (1) that the overall goals of the consent decree had not been met, and (2) that the 1984 and 1985 promotional examinations given by the City were discriminatory. While the Vanguards' motion to extend the consent decree was pending, a third promotional examination was administered in June 1988. A higher percentage of minorities passed the June 1988 examination than passed the 1984 and 1985 promotional examinations. However, the district court barred any promotions based upon the 1988 promotional examination pending the resolution of the Vanguards' motion.
 
 
 9
 In response to the Vanguards' motion, the parties entered into negotiations under the supervision of a magistrate judge. In June 1992, the Vanguards and the City entered into a proposed Stipulation and Order which recommended modifications to the 1983 consent decree. Under the terms of the proposed Stipulation and Order, the amended decree would be extended for approximately two more years with one-for-one promotions of minorities and nonminorities until all qualified minorities had been promoted, which would continue for the duration of the eligibility lists from the 1988 examination. In a report and recommendation issued in June 1992, the magistrate judge recommended that the district court approve the proposed Stipulation and Order extending the consent decree for approximately two more years.
 
 
 10
 Subsequently, the Union filed objections to the proposed Stipulation and Order, asserting that the consent decree did not need to be extended because its goal, or goals, had been largely met and also asserting that the 1984 and 1985 promotional examinations were not discriminatory. On October 27, 1992, the district court held an evidentiary hearing on the proposed Stipulation and Order. The Vanguards presented evidence showing that the 23 percent goal for minority representation in the City's Division of Fire would be reached if one-for-one promotions were made over a period of approximately two years using the results of the 1988 promotional examination. The Vanguards also presented evidence that if the proposed Stipulation and Order modifying the consent decree was not approved, the percentage of minority officers in the City's Division of Fire would fall from its then current figure of approximately 17 percent to approximately 14 percent.
 
 
 11
 Both the Vanguards and the Union also proffered other evidence concerning the validity of the 1984 and 1985 promotional examinations. Specifically, the Union proffered the testimony of an expert in promotional examinations who was apparently prepared to testify that the 1984 and 1985 examinations were valid under the EEOC guidelines and not discriminatory, and the Vanguards proffered the testimony of an expert in promotional examinations who was apparently prepared to testify that the 1984 and 1985 examinations were discriminatory under the EEOC guidelines and therefore invalid. However, the district court declined to consider the proffered testimony from either the Union or the Vanguards based upon the court's determination that the validity of the 1984 and 1985 promotional examinations were not relevant to the question of whether or not the consent decree should be extended.
 
 
 12
 On November 25, 1992, the district court issued an order accepting the proposed Stipulation and Order and modifying the consent decree stating: "there is a significant public interest concern with fulfilling the objectives and goals of [the consent decree]." J.A. 35. The court further stated that "[e]ven though substantial progress [had] been made under the [consent decree]," the goals of the consent decree "[had] not been obtained" and that "substantial compliance is not adequate in the civil rights realm." J.A. 35. Furthermore, the district court found that by extending the consent decree, the goals of the decree "will be fulfilled in a short period of time and this action will then come to an end"; however, if the decree was not modified, "it is evident that minority participation will regress and ... the goals of the [consent decree] will not have been achieved, but will be frustrated." J.A. 35-36. Consequently, the district court approved the Stipulation and Order, thereby permitting the provisions of the 1983 decree to remain in effect for the duration of the eligibility lists from the 1988 promotional examination. Finally, in its order approving the modification to the consent decree, the district court stated that when the eligibility lists from the 1988 promotional examination expire, "[n]o further extensions of the goals of the [consent decree] will be permitted ... even if said goals have not been met, provided that the City acts in good faith ... and complies with the terms of [this] Order and with applicable law." J.A. 38. This timely appeal by the Union followed.[1]
 
 II.
 A.
 
 13
 This court reviews a district court's modification of a consent decree under an abuse of discretion standard. Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141, 1147-48 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993). " 'A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.' " Id. at 1148 (quoting Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 479 (6th Cir.1987)). Further, "[m]odification of a consent decree requires 'a complete hearing and findings of fact.' " Akers v. Ohio Dep't of Liquor Control, 902 F.2d 477, 479 (6th Cir.1990) (per curiam) (quoting Brown v. Neeb, 644 F.2d 551, 560 (6th Cir.1981)).
 
 
 14
 "A consent decree is a strange hybrid in the law." Brown, 644 F.2d at 557. It is both "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order ... plac[ing] the power and prestige of the court behind the compromise struck by the parties." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983). Hence, a consent decree is a "settlement agreement subject to continued judicial policing." Id. Accordingly, the " 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' " or by what " 'might have been written had the plaintiff established his factual claims and legal theories in litigation.' " Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) (quoting United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). However, a consent decree should be construed to preserve the position for which the parties bargained. Vogel v. City of Cincinnati, 959 F.2d 594, 598 (6th Cir.) (citing Williams, 720 F.2d at 920), cert. denied, --- U.S. ----, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992).
 
 
 15
 Nevertheless, judicial approval of a consent decree places the power and prestige of the court behind the agreement reached by the parties. Williams, 720 F.2d at 920. "Once approved, the prospective provisions of the consent decree operate as an injunction." Id. (citing Plumer v. Chemical Bank, 668 F.2d 654, 659 (2d Cir.1982)). The injunctive quality of a consent decree compels the approving court to: (1) retain jurisdiction over the decree during the term of its existence, (2) protect the integrity of the decree with its contempt powers, and (3) modify the decree if "changed circumstances" subvert its intended purpose. Id. Further, even if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well-settled that " 'courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.' " Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d 914, 917 (6th Cir.1979) (quoting Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1371 (6th Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976)).
 
 
 16
 In Heath v. DeCourcy, 888 F.2d 1105 (6th Cir.1989), this court set forth the standard for modification of consent decrees arrived at by mutual agreement of the parties. We stated that
 
 
 17
 [t]o modify such consent decrees, the court need only identify a defect or deficiency in its original decree which impedes achieving its goal, either because experience has proven it less effective, disadvantageous, or because circumstances and conditions have changed which warrant fine-tuning the decree.
 
 
 18
 Id. at 1110. The modification must further the purpose of the consent decree, without upsetting the basic agreement between the parties. Id.
 
 
 19
 However, in Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court adopted a slightly more restrictive but flexible standard to be applied by the courts in rulings on motions to modify consent decrees under Federal Rule of Civil Procedure 60(b). Under Rufo, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." Id., --- U.S. at ----, 112 S.Ct. at 760. The party "seeking modification of a consent decree may meet its initial burden by showing either a significant change in factual conditions or in law." Id. Modification of a consent decree is appropriate: (1) "when changed factual conditions make compliance with the decree substantially more onerous," (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest." Id. But "modification should not be granted where a party relied upon events that actually were anticipated at the time it entered into a decree." Id.[2]
 
 
 20
 The consent decree at issue in Rufo involved institutional reform litigation; namely, prison reform litigation. However, in Lorain NAACP, this court held that a consent decree involving school desegregation was "subject to the same standards enunciated in Rufo and Heath." 979 F.2d at 1149. This court specifically noted that while "Rufo and Heath involved prison reform, we have found no indication, nor is there any reason to believe, that this type of case has somehow been set apart from other institutional reform litigation." Id. Further, in Lorain NAACP, this court summarized the reasons why a lesser showing was sufficient for the modification of "consent decrees entered in settlement of so-called 'institutional reform' litigation involving and affecting the operation of governmental institutions or organizations." Id. at 1148. First, institutional consent decrees " 'affect more than the rights of immediate litigants.' " Id. at 1149 (quoting Heath, 888 F.2d at 1109). Second, broad judicial discretion to modify the consent decree " 'is required so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal.' " Id. (quoting Heath, 888 F.2d at 1109). Finally, the courts require the ability to modify consent decrees in the institutional reform context because "such [consent] decrees often remain in place for extended periods of time, [and therefore] the likelihood of significant changes occurring during the life of the decree is increased." Id. (quoting Rufo, --- U.S. at ----, 112 S.Ct. at 758).
 
 
 21
 The Union argues that the district court erred in modifying the consent decree because the district court failed to apply the two-part, or two-step, Rufo test to determine whether the modification was warranted. Specifically, the Union asserts that the City and the Vanguards failed to demonstrate that a significant change in factual conditions or in law had occurred since the adoption of the consent decree in 1983. The Union further asserts that the district court failed to determine whether the modification to the consent decree "was suitably tailored to the circumstances warranting the modification." Appellant's Brief at 14.
 
 
 22
 We hold that the modification to the consent decree approved by the district court satisfies both the Heath standard and the two-part Rufo standard for the modification of a consent decree. Here, the parties to the consent decree, the Vanguards and the City, demonstrated a significant change in factual circumstances which made compliance with the decree "more onerous," and also demonstrated that without the extension embodied in the modification to the consent decree, the decree was rendered "unworkable" and "detrimental to the public interest." Specifically, the City and the Vanguards established that the lower than expected pass rates by minorities on the 1984 and 1985 promotional examinations and the resulting slower than expected promotion rate for minorities, a significant change in factual circumstances, caused the consent decree to become "unworkable" as well as "detrimental to the public interest" as a vehicle for curing the previously discriminatory promotion practices in the City's Division of Fire.
 
 
 23
 The evidence presented to the district court showed that due to the lower than expected minority pass rates on the 1984 and 1985 promotional examinations and the resulting slower than expected minority promotion rate, the City had been incapable of reaching the overall goal set forth in the consent decree of 23 percent for minority employment in supervisory positions in the Division of Fire. Rather, as the consent decree was about to expire, minorities held approximately 17 percent of the supervisory positions in the Division of Fire. Moreover, the evidence also showed that unless the consent decree was modified to prevent its expiration, the percentage of minorities in the Division of Fire would "regress" from approximately 17 percent to approximately 14 percent. Clearly, such a regression in minority employment would be detrimental to the public interest since it would permit vestiges of past discrimination in promotional practices to linger in the City's Division of Fire.
 
 
 24
 Further, the district court found that the changed circumstances, i.e., the lower than expected minority pass rates on the 1984 and 1985 promotional examinations, had prevented the core objectives of the consent decree from being met. In Jansen v. City of Cincinnati, 977 F.2d 238, 244 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993), this court emphasized that the probing of the underlying goal of a consent decree is necessary before the decree could be dissolved. See also Youngblood v. Dalzell, 925 F.2d 954, 960 (6th Cir.1991) ("[T]he proper standard for deciding whether a school desegregation decree should be dissolved is whether the purposes of the desegregation litigation, as incorporated in the decree, have been fully achieved.") (citing Board of Educ. v. Dowell, 498 U.S. 237, 247-48, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991)).
 
 
 25
 In the district court, the Union argued that the goal of the consent decree had been substantially achieved since the number of minorities in the supervisory ranks of the City's Division of Fire had increased from around 5 percent to approximately 17 percent while the consent decree was in force, and, consequently, that the consent decree should be allowed to expire. However, the district court properly focused on the goal of the consent decree; i.e., eliminating the results of past discrimination in promotional practices of the City's Division of Fire by increasing the number of minorities in supervisory positions in the Division of Fire to approximately 23 percent. The district court's conclusion that without the modification extending the life of the consent decree for two more years, the number of minorities in supervisory ranks of the City's Division of Fire would regress is not clearly erroneous.
 
 
 26
 Further, the district court's conclusion that the underlying goal of the consent decree was to increase minority participation in the supervisory ranks of the City's Division of Fire is supported not only by the language of the consent decree, but also by the actions of the parties to the consent decree, the City and the Vanguards. In this case, when it became apparent that the consent decree was about to expire with the 23 percent goal unsatisfied, the City and the Vanguards negotiated a modification to the consent decree which would keep the consent decree in operation for a relatively short period of time and allow the City to meet the 23 percent goal. Thus, a significant change in circumstances which warrants revision of the consent decree is present in this case.
 
 B.
 
 27
 The Union also argues that, even if a significant change in circumstances is present in this case, the modification to the consent decree is not suitably tailored to the changed circumstances. However, contrary to the Union's assertions, the modification to the consent decree is suitably tailored to the change in circumstances. The modification to the consent decree extends the operation of the consent decree for a relatively short period of time, approximately two years. Further, the modification operates along the lines of the consent decree. Under the modification, the terms of the consent decree would remain in operation during the eligibility period for the 1988 promotional examination, and the City would continue promoting minority and non-minority firefighters on a one-to-one basis until there were no more qualified minority firefighters remaining. Thus, in this case, the parties to the consent decree are in agreement that the consent decree should be modified. Further, the modification merely allows additional time in which to promote the minority firefighters as would have occurred under the consent decree, if the minority pass rates on the 1984 and 1985 promotional examinations had not been lower than expected. Moreover, the modification preserves and furthers, rather than alters, the agreement of the parties in the consent decree, and the short-term extension of the consent decree merely gives the City more time to promote minority firefighters as the parties had contemplated would have happened earlier.
 
 
 28
 Finally, and most importantly, just as with the consent decree, the promotions under the modified consent decree will not result in the promotion of unqualified minority firefighters, because only qualified minority firefighters, those minority firefighters who took and passed the 1988 promotional examination, will be promoted to the supervisory ranks of the City's Division of Fire under the modification to the consent decree. Accordingly, the modification to the consent decree is suitably tailored to meet the significant change in circumstances which warranted the modification.
 
 C.
 
 29
 Finally, the Union argues that the district court abused its discretion when it rejected the Union's proffered evidence that the 1984 and 1985 promotional examinations were not discriminatory. As noted previously, the district court declined to hear the testimony of the Union's expert witness, an expert on promotional examinations, who was prepared to testify that the 1984 and 1985 promotional examinations were valid under the EEOC guidelines and not discriminatory. Likewise, the district court also declined to hear the testimony of the Vanguards' expert witness, another expert on promotional examinations, who was prepared to testify that the 1984 and 1985 promotional examinations were discriminatory.
 
 
 30
 However, as discussed above, the district court found that the core objective of the consent decree; namely, the elimination of all vestiges of the City's previously discriminatory promotion practices in the Division of Fire by achieving 23 percent minority representation in the supervisory ranks, had not been met. Here, the district court based its modification on those grounds, not the issue of whether or not the City's 1984 and 1985 promotional examinations were valid or discriminatory. Assuming arguendo that the district court had heard the Union's proffered evidence and determined that the 1984 and 1985 promotional examinations had been valid, the most the district court could have concluded was that despite the City's compliance with the terms of the consent decree, the core objectives of the consent decree had not been met. Furthermore, whether the promotional examinations were discriminatory or not, the expected minority pass rates on the 1984 and 1985 examinations were lower than expected.
 
 
 31
 The same argument as the Union advances in this case was heard and rejected by the First Circuit in Mackin v. City of Boston, 969 F.2d 1273 (1st Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993). In Mackin, thirty-five white firefighters sued the City of Boston alleging discrimination on the part of the City when it made appointments to the fire department based upon an eligibility list that had been compiled in conformity with the provisions of a consent decree. The firefighters argued that "the [consent] decree was satisfied because the qualifying examination that they passed was validated under EEOC guidelines and was, therefore, nondiscriminatory." Id. at 1277. The court rejected that argument, stating that the firefighters' argument
 
 
 32
 overlook[ed] the language of the [consent] decree itself. Even a cursory reading makes it crystal clear that validated examinations are not an end in themselves but merely a means toward achieving the decree's actual objective: rough parity (to remedy the effects of past discrimination).
 
 
 33
 Id. The First Circuit went on to state that
 
 
 34
 [t]he district court, noting that the test's validity was disputed, correctly ruled that the issue was not material. Even if the examination was nondiscriminatory, as appellants alleged, the paucity of minority representation in the [Boston Fire] Department betokened a failure to achieve the central goal of the decree, thus negating any argument that the purposes of the decree had been achieved.
 
 
 35
 Id. at 1277 n. 3. See also Brown v. Neeb, 644 F.2d 551, 561 n. 17 (6th Cir.1981):
 
 
 36
 Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in light of experience.
 
 
 37
 Thus, in this case, the district court did not err in refusing to hear the evidence proffered by the Union. The validity of the 1984 and 1985 promotional examinations was not material to the question of whether or not the core objective of the consent decree had been achieved. Even if the Union had established to the district court's satisfaction that the promotional examinations were valid, that still would not have changed the fact that minority employment in the supervisory ranks of the City's Division of Fire was significantly below the goals embodied in the consent decree.
 
 
 38
 Accordingly, the district court did not abuse its discretion in approving a modification to the consent decree, which temporarily extended the provisions of the consent decree, without determining whether or not the City was engaged in ongoing discrimination in the promotion practices it used for the Division of Fire. The district court's decision to approve the proposed extension of the consent decree was an appropriate exercise of the court's discretion under both the express terms of the consent decree and the court's inherent power to modify a consent decree to effectuate the purposes of the decree.
 
 III.
 
 39
 For the reasons stated, the district court is AFFIRMED.
 
 
 
 *
 The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 In their brief, the Vanguards state: "[o]n March 26, 1993, the City made 107 promotions pursuant to the Stipulation and Order, 35 of which went to minorities. As a result the minority percentage now stands at 23% in the supervisory ranks." Brief of Plaintiffs-Appellees at 9
 
 
 [2]
 In adopting its flexible standard for modification of consent decrees, the Rufo Court also held that the "grievous wrong" standard of United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), does not apply to the modification of consent decrees. Rufo, --- U.S. at ----, 112 S.Ct. at 764. The Swift standard stated that:
 Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 Swift, 286 U.S. at 119, 52 S.Ct. at 464.