NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0515n.06

No. 18-5680

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALICIA M. PEDREIRA; PAUL SIMMONS; JOHANNA W.H. VAN WIJK-BOS; ELWOOD STURTEVANT, | ) ) ) | **FILED**<br>Sep 02, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| SUNRISE CHILDREN'S SERVICES, INC., fka Kentucky Baptist Homes for Children, Inc.; ADAM MEIER, Secretary, Cabinet for Health and Family Services; JOHN TILLEY, Secretary, Justice and Public Safety Cabinet, | ) ) ) ) ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) ) | |

BEFORE:   STRANCH, BUSH, and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Kentucky taxpayers sued the State of Kentucky and Sunrise Children's Services, a religiously affiliated organization, alleging that Kentucky violated the Establishment Clause by paying Sunrise for religious services that the taxpayers allege Sunrise imposes on children in State custody.  The taxpayers and Kentucky, without Sunrise, entered into a consent decree in which the taxpayers agreed to dismiss the suit in exchange for Kentucky's agreement to make certain changes to its foster-care system.  The district court refused to enforce the decree, asserting that it violated Kentucky law.  The taxpayers filed this interlocutory appeal.  We **AFFIRM** the decision below.

## I.    BACKGROUND

In April 2000, Kentucky taxpayers sued the state of Kentucky and Sunrise, formerly known as Kentucky Baptist Homes for Children, alleging that Kentucky violated the Establishment Clause by funding Sunrise—a private, religiously oriented organization that provides services for children in Kentucky's custody. *See Pedreira v. Ky. Baptist Homes for Children, Inc.* (*Pedreira I*), 579 F.3d 722, 725 (6th Cir. 2009), *cert. denied*, 563 U.S. 935 (2011). Plaintiffs' allegations include that numerous children in the care of Sunrise were not allowed to practice their own religion, not given a choice whether to attend religious services, or experienced some form of discipline for not attending certain religious services.

The district court granted Defendants' motion to dismiss the suit for lack of standing. On appeal, we reversed, holding that Plaintiffs did have standing as Kentucky taxpayers to bring their claims. *Id.*

### A.    Initial "Settlement Agreement"

Seven years after this suit was filed, Plaintiffs and Kentucky entered a Settlement Agreement to resolve the case, without Sunrise's approval. The Agreement denied that Kentucky (or Sunrise) violated the Establishment Clause or other rights of the children under Sunrise's care, but it required Kentucky to modify the terms of its standard two-year contracts—Private Child Care Agreements (PCC Agreements)—with Sunrise and other child-care providers and agencies. The terms of the Agreement seek to prevent publicly-funded, private child-care providers from engaging in any form of religious indoctrination, proselytization, or coercion of children in Kentucky's public child-care system. The terms require providers to inform a child and the child's parent of a child-caring facility's religious affiliation, to provide children with opportunities to attend a church of their choice, and to provide non-religious alternatives. Providers must also agree not to discriminate against children on the basis of religion and, once the children leave their

care, must give them an exit survey that asks about their experiences and whether the provider attempted to convert the child to a new religion.

The Agreement includes monitoring provisions requiring Kentucky to provide information to organizations such as the American Civil Liberties Union (ACLU) and Americans United for Separation of Church and State (Americans United) concerning the religious beliefs of the children in Sunrise's care, those children's exit surveys, any reports by the State's caseworkers for those children, and records of any religious activities at Sunrise's group homes. The Agreement also requires Kentucky to provide the ACLU and Americans United similar information about providers other than Sunrise in the event Kentucky receives and investigates a complaint about the provider. Finally, the Agreement contemplates the possibility of Kentucky enacting new regulations to implement some of its provisions. Specifically, if new or modified administrative regulations "must be enacted to comply with the terms" of the Agreement, Kentucky must "initiate the process of modifying any [such] administrative regulations." Kentucky does not have to guarantee that it will enact or modify any regulation, and a failure to do so would not constitute a violation of the Agreement.

In exchange, Plaintiffs promise to dismiss their lawsuit with prejudice and waive any claims based on conduct occurring before the settlement. The Settlement Agreement provides that the Kentucky district court that enters the agreement has exclusive jurisdiction to enforce it. Plaintiffs, Kentucky, and the ACLU and Americans United have the same rights to enforce the Agreement; Sunrise does not. The terms also indicate that the Agreement is not a "consent decree" and purports to divest the district court of its power to hold Kentucky in contempt if the state violates the Agreement.

Plaintiffs and Kentucky agreed on the settlement terms and filed a motion asking the district court to dismiss the suit and retain jurisdiction to enforce the Settlement Agreement. Sunrise objected and filed a motion to dismiss for lack of jurisdiction. The court denied Sunrise's motion, granted Plaintiffs' motion to dismiss, entered an order incorporating the Agreement, and retained jurisdiction to enforce the order. Sunrise appealed.

On October 6, 2015, we determined that Sunrise had standing to object to and appeal the Settlement Agreement. *Pedreira v. Sunrise Children's Servs. Inc.* (*Pedreira II*), 802 F.3d 865, 869 (6th Cir. 2015). We reaffirmed Plaintiffs' standing to bring the suit and held that the district court did not abuse its discretion by labelling its dismissal of the case as a dismissal with prejudice. *Id.* at 870–71. Examining the Agreement, we determined that it had the key attributes of a consent decree: "the [district] court expressly retained jurisdiction to enforce compliance with the settlement's terms; and by incorporating the settlement into the court's own dismissal order, the court gave its imprimatur to the settlement's terms." *Id.* at 871. We remanded the case for consideration of the Agreement as a consent decree and directed the district court to address whether it was fair, reasonable, and consistent with the public interest. *Id.* at 872. Specifically, the district court was to determine whether the consent decree was fair to Sunrise and to allow anyone affected by the decree an opportunity to present evidence and have its objections heard. *Id.*

## B. Amended Agreement ("Consent Decree")

On November 18, 2015, the parties to the original Agreement entered into a First Amendment to the Settlement Agreement (the Amendment) to address concerns related to singling out Sunrise for special monitoring. The Amendment alters the original Agreement in two important respects. First, the monitoring provisions were deleted entirely and replaced with language that does not mention Sunrise specifically, instead referencing "any Agency." (R. 552-

2, PageID 6277)  One of the recitals for the Amendment states that "the Parties desire to amend the Settlement Agreement to eliminate any 'singl[ing] out' of or potential reputational harm to Sunrise by uniformly applying the same monitoring triggers and rules to all Agencies, as set forth in this Amendment."  (*Id.* at PageID 6276 (alteration in original))

Second, the Amendment adds clarifications, "in light of objections raised by Sunrise during briefing concerning the Settlement Agreement."  (*Id.*)  The Amendment provides that no regulatory changes are needed to comply with or enforce the Agreement:  "Notwithstanding any references in the Settlement Agreement to possible enactment of new or modified administrative regulations, the Parties agree that the Commonwealth Defendants do not need to enact or modify any administrative regulations to comply with the Settlement Agreement."  (*Id.* at PageID 6278) Unlike the treatment of the monitoring provisions and the Settlement Agreement's reference to Sunrise, the parties to the Amendment did not remove or change language concerning enacting or modifying regulations.

Otherwise, the Amendment provides that "all the terms of the Settlement Agreement shall remain in full force and effect, and the Parties shall continue to comply with the Settlement Agreement, as amended herein, including during the pendency of any further proceedings in, or relating to dismissal of, the Lawsuit."  (*Id.*)  Plaintiffs and Kentucky again agreed to file a joint motion in the district court requesting approval of the Settlement Agreement as amended, dismissal of the suit with prejudice, incorporation of the Agreement into the Court's order of dismissal, and retention by the court of jurisdiction to enforce the order.  (*Id.*)

### C.      Change in Administration and Opposition to Amended Agreement

On December 8, 2015, Kentucky Governor Matt Bevin assumed office.  On April 11, 2016, the Governor's Office notified Plaintiffs' counsel that it had undertaken a "fresh appraisal" of this case and concluded that it would not consent to the Amended Agreement.  The Governor's Office

took the position that the Amended Agreement was not fair, reasonable, or consistent with the public interest and that it did not wish to pursue the Agreement on remand.

Plaintiffs separately and individually moved the district court to enter the Amended Agreement and to dismiss the suit on June 27, 2016. Kentucky and Sunrise opposed the motion; Kentucky specifically asserted "a change in administration and, in every respect, philosophy, following Governor Matthew G. Bevin's election in November 2015." Defendants argued that the Amended Agreement was unenforceable for lack of consent and that the district court lacked authority to enter and enforce it. The district court issued an order rejecting Defendants' arguments and determining that, regardless of the change of administration, the Amended Agreement remained a viable proposed consent decree and that it would schedule the matter for a fairness hearing.

Sunrise filed a motion for reconsideration of the district court's order, challenging the Amended Agreement's lawfulness and contending that the decree could not be lawfully implemented without modifying or expanding Kentucky regulations. The court granted that motion, concluding that the Amended Agreement violates Kentucky law because it requires enactment of new or modified administrative regulations to be implemented. *See Pedreira v. Sunrise Children's Servs., Inc.*, No. 3:00-CV-210, 2018 WL 2435424, at *12 (W.D. Ky. May 30, 2018). The court refused to enforce the Amended Agreement. *Id.*

Plaintiffs filed an interlocutory appeal of the district court's refusal to enter the Amended Agreement, and Defendants moved to dismiss the appeal, arguing that we lacked jurisdiction to hear it. On October 24, 2018, we denied Defendants' motion to dismiss. The appeal is now before us on the merits.[1]

---

[1] Since the filing of this appeal, there has been another change of administration. In 2019, Andrew Graham Beshear—son of former Kentucky Governor Steven Beshear who served just before Governor Bevin—was

## II.   ANALYSIS

We must first ascertain jurisdiction and Plaintiffs' Article III standing before turning to the merits.

### A.   Jurisdiction and Standing

Defendants argue again that we lack jurisdiction to hear this appeal because the district court's order refusing to enter the Amended Agreement is not final and appealable under 28 U.S.C. § 1291. We considered this argument before and rejected it, reasoning that the order (1) has "the practical effect of refusing an injunction," (2) threatens a "serious, perhaps irreparable consequence," and (3) "can be 'effectively challenged' only by immediate appeal." We explained that because "the terms of the settlement agreement are beyond the relief sought in the complaint," Plaintiffs have demonstrated "irreparable consequence because they will lose the 'bargain' they obtained through negotiation." Defendants offer no new bases to suggest that we lack jurisdiction. And, upon reviewing our prior order, there is nothing indicating that our determination and reasoning are flawed. We have jurisdiction to hear this appeal.

Sunrise nevertheless contends that Plaintiffs lack standing to challenge the district court's refusal to enter the Amended Agreement on the basis that the relief sought exceeds the scope of Plaintiffs' standing for the Establishment Clause claim. It argues that Plaintiffs advocate on behalf of non-parties (the children) for the enforcement of the Amended Agreement and that Plaintiffs, as taxpayers, may only seek relief in the form of a prospective injunction against the state's unlawful spending. But in *Pedreira II*, 802 F.3d at 870, we held that the requirements for state taxpayer standing set forth by the Supreme Court in *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125, 138–40 (2011), apply. The *Winn* Court explained that for

---

elected Governor of Kentucky and is currently serving in that position. Nothing has been filed with the court altering the position of the parties since that change in administration.

taxpayer standing, (1) "there must be a 'logical link' between the plaintiff's taxpayer status 'and the type of legislative enactment attacked,'" *id.* at 138 (quoting *Flast v. Cohen*, 392 U.S. 83, 102 (1968)); and (2) "there must be 'a nexus' between the plaintiff's taxpayer status and 'the precise nature of the constitutional infringement alleged,'" *id.* at 139 (quoting *Flast*, 392 U.S. at 102). We have twice held that Plaintiffs satisfy these requirements and have standing as Kentucky taxpayers to bring their Establishment Clause claim. *See Pedreira I*, 579 F.3d at 732–33; *Pedreira II*, 802 F.3d at 870.

We "may not revisit [standing] 'unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules' the earlier panel." *Id.* (quoting *Ward v. Holder*, 733 F.3d 601, 608 (6th Cir. 2013)). Citing *Frank v. Gaos*, 139 S. Ct. 1041 (2019) (per curiam), Sunrise argues that Plaintiffs must establish standing specifically for their request for approval of the Amended Agreement, separate from their standing for the Establishment Clause claim. *Id.* at 1046 (vacating and remanding a judgment affirming approval of a cy pres-only settlement so that the lower court could determine first whether any named plaintiff—objectors to the settlement—had Article III standing). But *Frank* does not stand for that proposition. The Supreme Court remanded *Frank* because neither the district court nor the court of appeals assessed objectors' standing under the operative complaint or the Settlement Agreement. That is not the case here. *See Pedreira I*, 579 F.3d at 732–33; *Pedreira II*, 802 F.3d at 870. And Sunrise cites no inconsistent decision, or any case that contravenes our prior holding in *Pedreira I*, to support its proposition that Plaintiffs lack standing.

## B.     Merits Discussion

We have held that the Amended Agreement functions as a consent decree. *See Pedreira II*, 802 F.3d at 871–72. A district court's refusal to enter a consent decree is reviewed for an abuse of discretion. *See United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 491 (6th

Cir. 2010). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992), *cert. denied*, 509 U.S. 905 (1993)). A consent decree's legal validity is a question of law and thus reviewed de novo. *See United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1004 (6th Cir. 1992).

"A consent decree is a strange hybrid in the law." *Vanguards of Cleveland*, 23 F.3d at 1017 (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981)). "It is at once 'a voluntary settlement agreement which could be fully effective without judicial intervention' and 'a final judicial order placing the power and prestige of the court behind the compromise struck by the parties.'" *Lorain NAACP*, 979 F.2d at 1148 (brackets and ellipsis omitted) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). The "'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'" *Vanguards of Cleveland*, 23 F.3d at 1017 (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984)). Finally, "a consent decree should be construed to preserve the position for which the parties bargained." *Id.*

As a preliminary matter, Kentucky argues that it no longer consents to the Agreement and that the Amended Agreement is void. This issue is not dispositive and is easily discarded, as courts have considered the validity of a consent decree despite one party's change in consent after the terms were negotiated. *See Stovall v. City of Cocoa*, 117 F.3d 1238, 1242 (11th Cir. 1997) (citing *Allen v. Ala. State Bd. of Educ.*, 816 F.2d 575 (11th Cir. 1987); *Moore v. Beaufort Cnty*, 936 F.2d 159, 163 (4th Cir. 1991)).

The crux of the legal issue on appeal is whether the Amended Agreement violates Kentucky law. Because a consent decree is a "final judicial order[,]" the decree cannot be approved if it "is illegal." *Williams*, 720 F.2d at 920; *see also Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987) (emphasizing that "the court may not readily approve a decree that contemplates a violation of law"). Moreover, "[c]ourts must be especially cautious when state officials seek to achieve by consent decree what they cannot achieve by their own authority." *Coalition to Defendant Affirmative Action v. Granholm*, 473 F.3d 237, 245 (6th Cir. 2006) (brackets omitted) (quoting *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993) (en banc)). In relevant part, Kentucky law provides: "An administrative body shall not by internal policy, memorandum, or other form of action . . . [m]odify[,] . . . [e]xpand upon or limit a statute or administrative regulation . . . . Any administrative body memorandum, internal policy, or other form of action violative of this section or the spirit thereof is null, void, and unenforceable." KRS 13A.130. Also,

> any administrative body that is empowered to promulgate administrative regulations shall, by administrative regulation, prescribe, consistent with applicable statutes . . . [e]ach statement of general applicability, policy, procedure, memorandum, or other form of action that implements; interprets; prescribes law or policy; describes the organization, procedure, or practice requirements of any administrative body; or affects private rights or procedures available to the public[.]

KRS 13A.100(1).

Kentucky law and courts have a significantly limited view of an agency's authority. "Administrative agencies must strictly adhere to the standards, policies, and limitations provided in the statutes vesting power in them." *Portwood v. Falls City Brewing Co.*, 318 S.W.2d 535, 537 (Ky. 1958). "An administrative agency, as a purely statutory creation, possesses no inherent authority and derives all of its rule-making authority from legislative grant." *Fisher v.*

*Commonwealth*, 403 S.W.3d 69, 78 (Ky. Ct. App. 2013). "Where reasonable doubt exists concerning the proper scope of an administrative agency's power, the question must be resolved against the agency to limit its power." *Id.*

The parties dispute (1) whether the Amended Agreement is lawful, specifically whether its terms are encompassed by and fully consistent with existing provisions of Kentucky law; and (2) whether Kentucky is required to enact or modify regulations to implement the Amended Agreement. Each issue will be discussed separately.

### 1.    Existing Kentucky Regulations

The Amended Agreement contains somewhat contradictory language regarding the modification, expansion, or limitation of existing Kentucky regulations. Sections 2(a)(i) and (ii) provide that "Subject to the provisions of KRS § 199.801 and upon enactment of modified administrative regulations within Kentucky Administrative Regulations (KAR) Title 505 and KAR 922, . . . the Commonwealth Defendants shall . . ." (R. 552-1, PageID 6256) That language anticipates enacting or modifying administrative regulations to enforce the Agreement. Nevertheless, when we remanded the case for the district court to consider the proposed Agreement as a consent decree, Plaintiffs and Kentucky amended it to include the following:

> Section 3.    No regulatory changes needed. Notwithstanding any references in the Settlement Agreement to the possible enactment of new or modified administrative regulations, the Parties agree that the Commonwealth Defendants do not need to enact or modify any administrative regulations to comply with the Settlement Agreement.

(R. 552-2, PageID 6278) While this amendment arguably assuages concerns over any requirement to enact or modify existing regulations, Plaintiffs did not remove the above-mentioned language from sections 2(a)(i) and (ii). As the district court pointed out, that decision differed from Plaintiffs' decision to strike the monitoring provisions of the original agreement entirely and

-11-

replace them with new language in the amendment to address this court's fairness concerns. *See Pedreira*, 2018 WL 2435424, at *6.

The parties' agreement in the amended language that no new regulations are necessary is relevant, despite Defendants' argument to the contrary. *See Vanguards of Cleveland*, 23 F.3d at 1017 (emphasizing that "a consent decree should be construed to preserve the position for which the parties bargained"). But an expressly stated agreed upon term does not divest us of power to determine the validity or accuracy of the term. *See Pedreira II*, 802 F.3d at 871–72 ("Suffice it to say it takes more than this procedural two-step to circumvent our precedents regarding what counts as a consent decree and—more to the point—the requirements for entering one . . . . [O]ur precedents, and not the parties' recitations (even as incorporated by the district court), determine whether the order is a consent decree."). We must examine the substance of the Amended Agreement, which we have found to constitute a consent decree, and decide whether it comports with Kentucky law or requires new or modified administrative regulations. *See Vanguards of Cleveland*, 23 F.3d at 1017 (emphasizing that the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it" (quoting *Firefighters Local Union No. 1784*, 467 U.S. at 574)).

The district court held that six provisions—2(a)(i), 2(a)(ii), 2(b)(i), 2(b)(ii), 2(h), and 2(i)— require new regulations or modifications to existing regulations for implementation. These provisions and the district court's consideration of them will be discussed in turn.

### a. Sections 2(a)(i) and (ii)

Sections 2(a)(i) and (ii) set out the obligations of a provider in placing children in child-caring facilities and foster homes. Before placing any child at a child-caring facility, the child-caring facility and the child-placing agency must:

(i) inform the child, and the child's parent(s) or guardian if a parent or guardian can be contacted by the Commonwealth at the time of the placement, about the child-caring facility's religious affiliation . . . ; (ii) inquire whether the child or parent or guardian objects to the child being placed at such child-caring facility based on its identified religious affiliation; and if the child or parent or guardian so objects, (iii) consider such objection and make reasonable efforts to provide an alternative placement if an alternative placement exists.

(R. 552-1, PageID 6256–57)

Plaintiffs contend that "[a] host of statutes and regulations authorize . . . Defendants to implement these common-sense provisions." These statutes and regulations include the following provisions from the Kentucky Revised Statute (KRS) and Kentucky Administrative Regulations (KAR):

- **KRS § 199.801** — directing the Cabinet of Health and Family Services (the Family Cabinet)[2] to select "the type of placement that best suits the child's needs" and is "the best alternative for the child";

- **KRS § 620.090(2**) — providing that upon issuance of a temporary custody order, "[t]he child may also be placed in a facility or program operated or approved by the [Family Cabinet], including a foster home, or any other appropriate available placement" that is "least restrictive";

- **KRS § 620.140(1)(c)** — providing that when choosing a placement for a removed child, the Family Cabinet must "consider[] the wishes of the parent or other person exercising custodial control or supervision";

- **922 KAR 1:300 § 6(7)(a)(1)** — requiring private child-care providers to "demonstrate consideration for and sensitivity to . . . [the] religious background of a child in care";

- **922 KAR 1:300 § 7(1)(f)(4)** — requiring providers to take a "social history and needs assessment that includes medical, educational, developmental, and family history" of the child during the intake process;

- **922 KAR 1:300 § 7(3)(a)(5)(b)** — directing the child's treatment team to create a treatment plan based on "[s]ocial assessment" that includes information on a child's "[r]eligion";

---

[2] The Family Cabinet is a State of Kentucky government agency that administers child welfare programs, in addition to other family programs.

- **922 KAR 1:310 § 6(2)(b)** — directing child-placing agencies to then "select a foster home for a child based upon the individual needs of the child, including . . . [a]ny information concerning the child's needs in placement";

- **922 KAR 1:310 § 6(3)** — providing that "[a] child shall participate in the intake process to the extent that the child's age, maturity, adjustment, family relationships, and the circumstance necessitating placement justify the child's participation";

- **922 KAR 1:310 § 12(1)(h)** — providing that child-caring facilities must "[p]rovide a child placed by [a] child-placing agency with a family life, including . . . [o]pportunities for development consistent with the child's religious, ethnic, and cultural heritage";

- **922 KAR 1:310 § 19(4)(b)(5)** — directing child-placing agencies to obtain "[a] social history of the biological or legal parent, to include . . . [r]eligion or faith"; and

- **922 KAR 1:360 § 2(2)(k)** — providing that an appropriate placement for a child must take into consideration a child's history and needs, including a child's "[r]eligious background and practices."

The district court decided that sections 2(a)(i) and 2(a)(ii) limit Defendants' discretion to determine the placement of a child and modify existing regulations on the process of placing a child. The court explained:

> The provisions convert discretion into dialogue with children and parents and guardians concerning appropriate placement, and afford the child, parent or guardian near veto power on placement by objecting to the entity's religious affiliation. Not only does the child, parent, or guardian have a level of input which did not heretofore exist, but the Commonwealth Defendants and child-placing agencies are constrained to accept the objection and afford alternative placement, or justify, in writing, placement in a child-caring facility or foster home over the objection.

*Pedreira*, 2018 WL 2435424, at *8. The Amended Agreement states that "[n]othing in this subsection shall be construed to interfere with the Commonwealth Defendants' [or child-placing agency's] ability to exercise their reasonable and good faith discretion regarding the placement that it is in the best interest of the child." (R. 552-1, PageID 6256) The court found that this disclaimer did not prevent the limiting of an agency's discretion, and that the provisions do more

than monitor child-caring facilities as Plaintiffs contend; they require these entities to "engage in a pre-placement vetting process with the child and parent or guardian." *Pedreira*, 2018 WL 2435424, at *8.

Sections 2(a)(i) and (ii) allow for a child and/or parent to object to a placement proposition and that the child-caring facility or child-placing agency will consider that objection and alternative placements. These requirements appear to take place after all the procedures for placing a child have taken place, for which the above-mentioned regulations govern. After a placement determination consistent with Kentucky regulations has been made, the Amended Agreement imposes new obligations on the agency, including requiring "reasonable efforts" to find an alternative placement. Plaintiffs argue that the "reasonable efforts" requirement affords an agency discretion within existing regulations as opposed to mandating that the agency find an alternative placement. But such a requirement raises the question of what constitutes reasonable efforts, and no regulations or statutes specify what that entails or requires. Because administrative agencies in Kentucky are constricted in their authority to enforce and administer statutes and regulations, enforcement of the Amended Agreement would require enacting or modifying Kentucky regulations to ensure appropriate enforcement. *See Fisher*, 403 S.W.3d at 78.

### b. Sections 2(b)(i) and (ii)

Sections 2(b)(i) and (ii) require Defendants to inform children and their parents or guardians of their protections provided by the Amended Agreement. Those provisions provide:

(i)     Prior to placing any child . . . Defendants shall (A) inform the child, and the child's parent(s) or guardian . . . of the terms of the modified PCC Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e), and 2(f) of this Agreement; (B) inform the child, and the child's parent(s) or guardian[,] . . . of the contact information for the available Ombudsman for the Cabinet for Health and Family Services ('Ombudsman') and the Service Appeal Process set forth in 922 KAR 1:320 ('Service Appeal Process'), and that the Ombudsman and the Service Appeal Process are available in the event the child or parent or guardian has concerns regarding the [child-caring facility's or child-placing agency's] alleged violations of the terms of the modified PCC Agreement and

procedures set forth in Section 2(a), 2(d)(i)-(ii), 2(e), and 2(f); (C) provide the child with a document, that the child could keep on his or her person or in his or her room, containing information about the terms of the modified PCC Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process.

(ii)     The PCC Agreement shall be modified to provide that a child-caring facility shall post information, in at least one common area of the child-caring facility, about the terms of the modified PCC Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process; and that a child-placing agency shall post information, in a prominent place in each location operated by the child-placing agency, about the terms of the modified PCC Agreement and procedures set forth in Section 2(a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process.

(R. 552-1, PageID 6257–58)

Plaintiffs contend that these provisions are encompassed in the following existing Kentucky regulations:

- **922 KAR 1:300 § 7(1)(h)** — providing that "[b]efore admission, the child and custodian shall be informed in writing of their rights and the child-caring facility's responsibilities, including policy pertaining to the services offered to the child";

- **922 KAR 1:300 § 7(1)(i)** — providing that "[a] child shall be informed upon admission of the right to file a grievance"; and

- **922 KAR 1:320 §§ 6(1)(a), (7)(a)** — stating that the Family Cabinet provides people with a grievance form "at each case planning conference," as well as a "written statement describing appeal [grievance] rights."

Considering only the first regulation, the district court determined that sections 2(b)(i) and 2(b)(ii) require modifying existing Kentucky regulations by requiring Defendants, in addition to the child-caring facilities and child-placing agencies, to provide information relating to the religious rights of the child pre-placement. It also found that Defendants must inform the child and parent of the "terms of their contract" with the facilities and agencies, and of the terms of the Amended Agreement. *Pedreira*, 2018 WL 2435424, at *9. The court concluded that the

provisions limit Defendants in choosing the methods and means to monitor the child-caring facilities and impose additional obligations on Defendants in the child-placement process.

There is no dispute that the Amended Agreement and existing Kentucky regulations, specifically KAR 1:300 § 7(1)(h) and (1)(i), require facilities and agencies to inform a child and the parent or guardian about the child's rights and the entities' responsibilities. Requiring these entities to inform the child about the provisions within the Amended Agreement and the PCC agreements likely would not require modification of existing regulations because the agreements are merely an elaboration of those rights and responsibilities. But the context of these regulations demonstrate that they are directed at only the child-care facility and not the state of Kentucky. For example, § 7(1)(h) provides that "the child *and custodian* shall be informed in writing of their rights and the child-caring facility's responsibilities, including policy pertaining to services offered to the child." KAR 1:300 § 7(1)(h) (emphasis added). Because some children in the foster care system are in the custody of the Family Cabinet, *see* KRS § 620.090(1), a requirement that the Cabinet inform itself in writing lacks clarity. And the facility, not Kentucky, is in the best or perhaps only position, to provide information regarding its own policies pertaining to its services.

Plaintiffs nevertheless argue that "there is nothing in the regulation that prohibits the Family Cabinet and private childcare providers from acting as one another's agent in providing information to children."

While that is true, there is also nothing in the regulations that requires Kentucky to provide information consistent with the Amended Agreement's mandate. Plaintiffs also argue that the district court failed to consider 922 KAR 1:320 §§ 6(1)(a) and 7(a), which direct the Family Cabinet itself to inform its clients about the grievance procedure, specifically about their right to file a "Service Appeal." But these regulations are limited to parents, foster parents, and other

adults seeking review of an adverse action against them by the Cabinet, *see* 922 KAR 1:320 § 2, not children seeking redress for violations of their rights by child-care facilities.

Sections 2(b)(i) and 2(b)(ii) require modifying and/or expanding regulations so that Kentucky may participate in the process of informing children or, at a minimum, to establish that facilities and agencies have authority to conduct this process on Kentucky's behalf.

### c. Sections 2(h) and 2(i)

Sections 2(h) and 2(i) govern procedures Defendants must take when a child leaves a placement. Those provisions provide:

(h)     <u>Agency Exit Surveys</u>. The Commonwealth Defendants shall prepare a brief exit survey concerning the child's experiences and impressions regarding the child-care facility's religious activities and accommodations. During the week of a planned discharge for any child who has been in the care of a single child-caring facility for one month or longer, the Agency shall (i) provide the child with the exit survey, (ii) provide a secure location for the child to submit the exit survey anonymously, and (iii) submit the exit surveys to the Commonwealth Defendants on at least a quarterly basis. The Commonwealth Defendants shall maintain these exit surveys, organized by the Agency from which the surveys were received. Such exist survey shall include, but not be limited to, questions concerning whether the child experienced any alleged form of religious coercion, discrimination, or proselytization during such placement, as described in Section 2(f). The central office of the Department for Community Based Services or Department of Juvenile Justice, or their counsel, shall investigate any allegations of religious coercion, discrimination, or proselytization contained within the Exit Surveys, and take appropriate action, as necessary. The Commonwealth Defendants, in their reasonable and good faith discretion, shall determine whether any such allegation of religious coercion, proselytization, or discrimination may violate the terms of Sections 2(d), (e) or (f) of this Agreement and thus merits a referral of the complaint to the Office of the Inspector General within the Cabinet for Health and Family Services ('Office of the Inspector General') for further investigation and other appropriate action, as deemed necessary by the Office of Inspector General in its reasonable and good faith discretion.

(i)     <u>Case Manager Surveys</u>. The Commonwealth Defendants shall require case workers to (i) question all children on their caseload about the child's experiences and impressions regarding the Agency's religious activities and accommodation at one of the "home visits" made by the case worker annually, and (ii) document the children's responses

in TWIST, or through other similar documentation. The questions shall include without limitation inquiries regarding the activities prohibited by Section 2(f). If a case worker believes that an Agency has engaged in an act of religious coercion, discrimination, or proselytization, the case worker shall report such complaint and suspected behavior to the central office of the Department for Community Based Services or Department of Juvenile Justice, who shall investigate any such allegations, and take appropriate action, as necessary. The Commonwealth Defendants, in their reasonable and good faith discretion, shall determine whether any such allegation of religious coercion, discrimination, or proselytization may violate the terms of Sections 2(d), (e) or (f) of this Agreement and thus merits a referral of the complaint to the Office of Inspector General for further investigation and other appropriate action, as deemed necessary by the Office of Inspector General in its reasonable and good faith discretion.

(R. 552-1, PageID 6261–62)

Plaintiffs argue that "[t]hese provisions, too, do not modify or expand existing laws." They point to the following statutes and regulations for support:

- **922 KAR 1:300 § 6(7)(a)(1)** — requiring child-care providers to "demonstrate consideration for and sensitivity to . . . [the] religious background of a child in care";

- **922 KAR 1:300 § 7(6)(d)** — providing that "when a child is leaving a facility as a planned discharge, a predischarge conference shall be held to ensure that the child and family are prepared for successful transition into placement" and that the child, parent or guardian, and the treatment team are required to "attend this conference";

- **922 KAR 1:300 § 7(6)(e)** — requiring at least one "preplacement visit prior to [a] planned discharge";

- **922 KAR 1:300 § 7(6)(g)** — providing that "[u]pon discharge" a child's educational, medical, vocational, psychological, legal, and social needs "shall be assessed";

- **922 KAR 1:300 § 7(7)(a)(11)** — requiring child-care providers to maintain confidential records, including a "[d]ischarge summary";

- **KRS § 199.640(3)** — providing that "[e]ach licensed facility or agency shall be visited and inspected at least one (1) time each year by a person authorized by" the Family Cabinet and that "[a] complete record of the visit and inspection shall be filed" with the Family Cabinet;

- **922 KAR 1:305 § 6(1)** — providing that "[a] child-caring facility or a child-placing agency shall not deny access to a human services surveyor or other representative of the [Family Cabinet]";

- **922 KAR 1:330 § 6(1)** — authorizing Family Cabinet "to obtain necessary information to complete an investigation in a report of child abuse, neglect, or dependency" that occurs in a licensed child-caring facility;

- **922 KAR 1:360 § 2(2)(k)** — providing that making changes to a child's level of care or placement requires current information about the child's "[r]eligious background and practices"; and

- **922 KAR 1:360 § 3** — providing that, after placing a child with a provider, a Family Cabinet staff member must "[c]onduct a utilization review for a child . . . [s]ix (6) months from the initial placement" and "[e]very three (3) months thereafter[,]" "[r]eassign a child's level of care after the previous level has expired[,] . . . [m]onitor each child-caring facility and child placing agency[,] . . . [and m]aintain a confidential information system for each child" that includes placement history, level of care assignments, length of treatment, and discharge outcomes.

The district court determined that sections 2(h) and 2(i) present somewhat differing results. The court found that section 2(i)'s requirement for case manager surveys is acceptable because questions concerning religious accommodation and activities fall within the scope of existing regulations providing annual home visits by Kentucky case workers. But the court determined that section 2(h)'s mandate to require exit surveys "differ[ed] in kind and purpose" from the discharge and aftercare procedures provided. *Pedreira*, 2018 WL 2435424, at *11. Rather than gathering information for discharge planning of a child, the new exit surveys would serve as a form of "debriefing" to determine compliance with the Amended Agreement. *Id.* And sections 2(h) and 2(i) both require an investigation if certain allegations of religious coercion have been made, which the court determined was an obligation not present in existing regulations. The court concluded that sections 2(h) and 2(i) would require modification of existing regulations to be enforceable.

Plaintiffs argue that no modifications to existing regulations are necessary for discharge planning because, like the exit surveys, such planning takes into consideration a child's experiences while in private child-care. Plaintiffs also contend that the regulations grant broad

authority to the Family Cabinet to monitor child-caring facilities and that such monitoring includes investigation of religious coercion. But these assertions are not readily apparent in the regulations cited. The listed regulations concern discharge and aftercare obligations to ensure a child's smooth transition from one placement to another; they are forward-looking. *See* 922 KAR 1:300 § 6(7)(a)(1); 922 KAR 1:300 § 7(6)(d). Section 2(h), however, requires backward-looking information to assess a child's experience, which may trigger a subsequent investigation. While an investigation into allegations of unlawful conduct is encompassed in existing regulations, *see* 922 KAR 1:330 § 6(1), the district court correctly noted that the regulations do not say investigations are triggered and must be conducted based on allegations made in the exit survey. Sections 2(h) and 2(i) require modification of existing Kentucky regulations.

Plaintiffs maintain that Kentucky's prior practices and representations demonstrate that no new regulations are necessary because it has fully complied with the terms of the Amended Agreement for more than three years. Kentucky did so by revising the PCC Agreements to reflect the amended terms. And that the Amended Agreement was initially consented to and enforced does not necessarily mean that it is lawful. The court has an independent duty to evaluate the Amended Agreement and determine its legality. *Williams*, 720 F.2d at 920.

In sum, many of the provisions of the Amended Agreement require Defendants to modify or expand various regulations. Despite Plaintiffs' inclusion of amended language providing that no new regulations or modifications are necessary, the provisions themselves require modifications to be implemented and enforced under Kentucky law.

### 2. Additional Issues

Plaintiffs also argue that even if the Amended Agreement requires new regulations, the Commonwealth Defendants are bound by their contract to undertake "the process of adopting or modifying such regulations." But Kentucky did not necessarily consent to rulemaking here. The

Amended Agreement provides: "the Parties agree that the Commonwealth Defendants do not need to enact or modify any administrative regulations to comply with the Settlement Agreement." (R. 552-2, PageID 6278) And even the initial Settlement Agreement provided that Kentucky does not have to guarantee it will enact or modify regulations and that a failure to do so does not constitute a violation of the Agreement. (R. 552-1, PageID 6265)

Additionally, Plaintiffs request that we certify to the Kentucky Supreme Court the question of whether Kentucky law requires Kentucky to enact or modify regulations to implement the Amended Agreement. But this question is not new or unsettled. *See In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 607 (6th Cir. 2017) ("Certification to a state supreme court 'is most appropriate when the question is new and state law is unsettled . . . .'" (quoting *City of Columbus v. Hotels.com, L.P.*, 693 F.3d 642 (6th Cir. 2012))). "[T]he appropriate time to request certification of a state-law issue 'is before, not after, the district court has resolved [it].'" *Id.* (second alteration in original) (quoting *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015)). And because Plaintiffs chose to file this action in federal court, they cannot then "'seek refuge' in state court only after an unfavorable ruling." *Id.* (quoting *Hotels.com*, 639 F.3d at 654). We deny Plaintiffs' request for certification.

This case presents an unusual situation. The provisions of the consent decree did not explicitly require Kentucky to enact or modify regulations, and the positions of the parties have shifted during litigation. Our review, however, shows that the Amended Agreement, functioning as a consent decree, requires Kentucky to enact and modify regulations. Under Kentucky law, particularly KRS 13A.130, that requirement is not appropriate. The district court did not abuse its discretion by refusing to enter the Amended Agreement.

## III.   CONCLUSION

Based on the foregoing, we **AFFIRM** the decision of the district court.